## Case No. 8,413.

LIVINGSTON et al. v. JONES et al.

[1 Fish. Pat. Cas. 521;[1] 2 Pittsb. Rep. 68; 18 Leg. Int. 293; Merw. Pat. Inv. 658; 7 Pittsb. Leg. J. 169.]

Circuit Court, W. D. Pennsylvania. Nov. 17, 1859.

PATENTS—ADMISSION OF ORIGINALITY AND VALIDITY—PLEADING.

1. A party using contrivances to supplant another in the use of a patent, by obtaining the assignment of the extended term thereof, and by his answer and his cross-bill, admitting under oath

the validity of the patent, claiming the ownership of the extended patent, and praying an injunction against the complainant, must be regarded as admitting the originality and value of the patent, although he subsequently amends his answer and denies both.

2. It is not enough, to defeat the originality of an invention, that prior contrivances are produced which might, by a little change, have been made into the patented contrivance, though not so intended by the maker.

[Cited in Cook v. Ernest, Case No. 3,155; Pennsylvania R. Co. v. Locomotive Engine & Safety Truck Co., 110 U. S. 494, 4 Sup. Ct. 222.]

3. The originality and value of the Sherwood patent for Janus, or double-faced, door-locks, investigated and established.

This was a bill in equity [by Laureston R. Livingston, W. B. Copeland, James K. Morehead, and others against J. Hervey Jones, Alexander M. Wallingford, and others] to restrain the infringement of letters patent [No. 2,886], granted to John P. Sherwood, December 14, 1842; reissued October 7, 1856 [No. 401], and extended for seven years from December 14, 1856, and assigned to complainants. The claims of the reissued and extended patent were as follows: "I claim making the cases of door-locks and latches double-faced, or so finished that either side may be used for the outside, in order that the same lock or cased fastening may answer for a right or left-hand door, substantially as described. I also claim the peculiar construction and double-action (upon an inclined and horizontal track or way) of the locking-car, B. as hereinbefore described, and the combination of the locking-car, B. and safety-cars, GG 2, with one another, and with the connecting or vibrating bar and bolt. A. as within described, so as to fasten the bolt, C, securely, and prevent its being picked. I also claim so constructing the bolt as hereinbefore described, that by simply turning it over in the lock-case, it is adapted to a right or left-hand door."

[2] [The history and merits of the invention in question, were essentially thus: Till within a few years past most of the door-locks used in this country, were imported from England. It was an important object, therefore, to discover or invent some plan by which this article could be made more cheaply and better than the imported, notwithstanding the higher price of labor here. Such an inventor, who, by bringing his invention into market, could expel the foreign article, would evidently be a public benefactor, the article of door-locks being one of immense consumption in this country. This object was in part effected by making the locks of cast-iron; but a difficulty in the way of these cheaper productions was found in the fact that door-locks had to be made right and left, and a lock made for a right-hand door would have to be turned upside down in order to be used on a left-hand door, and vice versa. It became, therefore, a very important object to

---

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

[2] [From 18 Leg. Int. 293.]

those who manufactured, and to those who dealt in this article, that this difficulty of right and left hand locks should be some how obviated, and that every lock might be equally capable of use on right or left hand doors.

[An American, named Sherwood—under whom the complainants claimed—was the first to invent a mode of effecting this object, and soon succeeded in establishing a manufacture at once cheaper and better than the imported. His patent was for "a new and useful improvement in door-locks." The schedule stated that every part of the lock might be made of cast-iron as the cheapest material, but did not claim this as the patentee's discovery. "What I claim as my invention," is Sherwood's language, "is making the case of door-locks and latches double-faced, or so finished that either side may be used for the outside, in order that the same lock may answer for a right or left hand door."

[The defence set up to the bill was want of originality in the invention; and great numbers of locks were brought into court, many of them old and rusty things, which undoubtedly were cased on both sides. Three were specially relied on; one from the custom house, one from the city hospital, and one from the gate of St. Mark's Church. Several manufacturers of more or less reputation, who were offered as experts, testified that in their opinion these were not essentially different in principle from Mr. Sherwood's lock. But the defendants did not show either that any one of these locks had been made with an intention to obviate the difficulty of having right and left hand locks, or that practically any one of them had ever, in a single instance, been so used, or that any person, before Sherwood, in seeing any one of them, had conceived the possibility of thus applying them.

[The custom house lock was, in fact, from an open out-door gate. Its inside was covered tight in order to preserve the works of the lock from the weather and from rust—a device necessary in all out-door locks. It was not well suited for a Janus-faced lock, and was finished on one side only. It was a left-hand lock, and not a door-lock properly speaking, at all. The lock taken from the city hospital gate was a dead-lock; a right-hand lock. By putting it wrong side out, and making some alterations, it might have been converted into a left-hand dead-lock. The same was to be said of the gate-lock of St. Mark's Church, and of all the others. The mechanic who made the custom house lock in 1840, swore that it was intended and finished only as a left-hand lock; that he never thought of a Janus-faced lock, and never manufactured one; but had different patterns for right and for left hand locks. And yet undoubtedly to the eye of high inventive genius, the finished production of Sherwood was visible in nearly every one of these rude productions. It required but the "vital spark," to kindle

the train, and to convert, in an instant, the manufacture designed for one purpose, into an object applicable to quite another. Sherwood had no other merit than to have seen, in an instant, that which others had discovered without being in the least aware of it.][2]

Shaler & Co., Bakewell & Cushing, and E. M. Stanton, for complainants.

Stowe & Hampton, G. P. Hamilton, and Geo. Gifford, for defendants.

GRIER, Circuit Justice. The parties to this bill are two manufacturing firms, in the city of Pittsburg. They are both engaged in the manufacture of door-locks. The complainants claim to be the owners of a patent, granted to John P. Sherwood, for an improvement in door-locks, issued, originally, on December 14, 1842, and afterward extended for seven years, from December 14, 1856.

The bill charges the respondents with infringing this patent. The respondents' first answer admitted the use of the patented invention, but claimed that they are the true owners of the extended patent, and by a cross-bill, they prayed that complainants might be enjoined from using the invention. After the testimony had been taken on both sides, upon this issue involving the title to the patent, the respondents discovering that they must necessarily be defeated, obtained leave from the court to withdraw the answer and cross-bill which admitted the validity of the Sherwood patent, and to file another answer denying its originality and validity.

This being the only question in the case, it is unnecessary to notice further the history of the patent, its renewals and assignments. Till within a few years past, most of the door-locks used in this country were imported from England. It was an important object, therefore, to discover or invent some plan by which this article could be made cheaper and better than the imported, notwithstanding the higher price of labor here. Such an inventor who, by bringing his invention into market, could expel the foreign article, would evidently be a public benefactor; the article of door-locks being one of immense consumption in this country. This object was in part effected by making the locks of cast-iron. But another difficulty, in the way of their cheap production, was found in the fact that door-locks had to be made right and left, and a lock made for a right-hand door would have to be turned upside down in order to be used on a left-hand door, and vice versa. It became, therefore, a very important object to those who manufactured and to those who dealt in this article, that this difficulty of right and left-hand locks should be somehow obviated, and that every lock might be equally capable of use on right or left-hand doors.

Sherwood was the first to invent a mode of effecting this object, but, as it required the expenditure of a large capital and much

[2] [From 18 Leg. Int. 293.]

enterprise, to make and establish in the market, a new manufacture of this kind, the invention was not put into successful operation. The inventor had not the capital necessary, and failed to persuade others who had, to embark in the speculation. The complainants having embarked in the manufacture of door-locks, and properly appreciating the value of Sherwood's invention, sought out the inventor and purchased his patent, and have now succeeded in establishing a manufacture both cheaper and better than that imported.

There is no better evidence of the value of this invention than the contrivances used by the respondents to supplant the complainants, by obtaining the assignment of the extended term of the patent, which, they must have known, has been obtained by the money and active exertions of the complainants and for their use. Their conduct proves their apprehension of the value of the patent, and their oath on record admits its originality.

After such a course of conduct they must be held to make a clear case of mistake in the patent office and in their own sworn answer, as regards the originality of this invention. The patent is for a "new and useful improvement in door-locks." The schedule states that every part of the lock may be made of cast-iron, as the cheapest material, but does not claim that as the patentee's discovery.

The first improvement claimed, is in the case, which is to be made double-faced, and the schedule points out the form and mode of making the castings for such cases. The second improvement is in making the bolt with notches, as described, so as to put them, by simple reversion, to a right or left-hand door.

The claim, which it is admitted that respondents infringe, is as follows: "What I claim as my invention, and for which I desire an exclusive right by letters patent, is, making the cases of door locks and latches double-faced, or so finished that either side may be used for the outside, in order that the same lock or cased fastening may answer for a right or left hand door, substantially as described."

Simple as this improvement may appear at first view, it is clear it had never before been suggested or put in practice for the purpose of making a better manufacture at a cheaper rate. Before this patent, door-locks had not been so made, nor had it occurred to any one that, by these simple contrivances, this manufacture could be thus improved and cheapened.

The respondents, in support of the issue tendered by them, of want of novelty, have not pretended to prove that any one had ever manufactured Janus-faced door-locks with this device, intending thereby to obviate the difficulty of having right and left hand locks. But they have given evidence concerning certain locks on gates, which, having been necessarily made with close faces on each side, it is supposed, might, if used merely as dead-locks, have been applied either to right or left hand gates.

The complainants have taken the wise precaution of purchasing all these old locks and producing them in court in propria persona, accompanied, also, by the testimony of the manufacturer of the only one whose age is satisfactorily established to be older than the patent. An examination of these locks is much more satisfactory than the examination of the testimony of witnesses calling themselves experts and delivering opinions.

Not one of these locks was ever intended to be a right and left hand, or Janus-faced lock. The custom house lock is from an open out-door gate. Its inside is necessarily covered tight to preserve the works of the lock from weather and from rust—a device necessary in all out-door gate locks. It is not suited, and never intended, for a Janus-faced lock. It is evidently finished on one side only. It is a left-hand lock, and is not a door-lock at all.

The lock taken from the city hospital gate is a dead-lock, a right-hand lock. By putting it wrong side out, and making some alterations, it might be converted into a left-hand dead-lock. The same may be said of the gate-lock of St. Mark's Church, and all the others. The mechanic who made the custom house lock in 1840, swears that it was intended and finished only as a left-hand lock. That he never thought of a Janus-faced lock, and never manufactured one—but had different patterns for right and left hand locks.

It is abundantly clear from the inspection of these locks that the makers of them were not in search for a plan for Janus-faced locks, or aware of the value of such an invention. They may have stumbled over it, but not seeking it, did not think it worth picking up or examining. As in many other cases, they were near the invention, and might have made it if they had only thought of it. Those who are wise after the event, and who have been examined as experts, have given testimony which, when analyzed, amounts to this, and no more: that these gate-locks, being covered on the inside, might, by a little change, have been made into Janus-faced locks, though not so intended by the maker. This fact is now apparent to a mechanic who has seen the patented invention before him.

Experience has caused me to have little confidence in the opinions of experts and professors, who often have more knowledge than judgment. Courts and juries may be much benefited in their researches by the one, while they would be led into great error by confiding too much to the other.

The art of printing was stumbled over for five thousand years, and if a patent for it were now presented to our expert, he would show you, at once, that the whole art consisted in multiplying impressions from a combination of movable types. He would point you to the tracks of animals as original

impressions from movable types, and show the invention of printing letters to be as old as Adam.

Few patents could stand the test of such ingenuity as this. Incredible as it may appear, yet it is nevertheless true, that on the trial of the originality of Morse's telegraph, it was gravely argued, that two thieves in the penitentiary, who had corresponded by means of scratches and dots on the prison wall, had preceded Morse, in the invention of this most astonishing and useful art.

We are of opinion, therefore, that the defendants have not succeeded in establishing the defense pleaded in their amended answer, and that the complainants are entitled to the decree prayed for in their bill.

[For other cases involving this patent, see Jones v. Morehead, 1 Wall. (68 U. S.) 155; Livingston v. Jones, Case No. 8,414; Moorehead v. Jones, Id. 9,791.

[NOTE. A decree was entered in favor of complainants upon the account rendered for $13,-282.92. Thereupon they moved to treble the damages, under the act of July 4. 1836 (5 Stat. 123), but the court rendered a final decree for the sum above. Case No. 8,414. From this decree an appeal was taken to the supreme court, which reversed the decision. 1 Wall. (68 U. S.) 155.]